STEPHEN R. BASSER (121590)
sbasser@barrack.com
SAMUEL M. WARD (216562)
sward@barrack.com
**BARRACK, RODOS & BACINE**
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Tel.: (619) 230–0800
Fax: (619) 230–1874

ANDREW J. HEO*
aheo@barrack.com
Two Commerce Square
2001 Market Street, Suite #3300
Philadelphia, PA 19103
Tel: (215) 963-0600

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMBERLY WATSON, SHAQUITA HOUSTON, and LISA CHAPMAN Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br>v.<br><br>SALESFORCE, INC., and TRANSUNION, LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Amberly Watson, Shaquita Houston, and Lisa Chapman ("Plaintiffs"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant Salesforce, Inc. ("Defendant" or "Salesforce") and Defendant TransUnion, LLC ("TransUnion") (collectively referred to as "Defendants") and alleges, upon personal knowledge as to their own actions and upon information and belief, including their counsels' investigations, as to all other matters, as follows:

## I. NATURE AND SUMMARY OF THE ACTION

1. Plaintiffs bring this class action against Defendants for their failure to properly secure and safeguard sensitive personally identifiable information, such as names, dates of birth, Social Security numbers, billing addresses, email addresses, phone numbers (collectively, "PII"), provided by and belonging to their customers.

2. Defendant Salesforce is a software company that provides cloud-based software platforms for use in sales, marketing, e-commerce, analytics, customer service, and other uses to companies such as Defendant TransUnion.

3. Defendant TransUnion is a credit reporting agency that maintains the sensitive PII and financial information of tens of millions of Americans.

4. Beginning in June 2025, it was reported that Google had observed hackers conducting social engineering attacks against multi-national companies in order to steal data from Salesforce platforms operated by those companies. As reported by Bleepingcomputer:

> The attackers impersonate IT support personnel, requesting the target employee to accept a connection to Salesforce Data Loader, a client application that allows users to import, export, update, or delete data within Salesforce environments. . .
>
> The target organizations already use the Salesforce cloud-based customer relationship management (CRM) platform, so the malicious request to install the tool appears legitimate within the attack's workflow. "Threat actors abuse this by persuading a victim over the phone to open the Salesforce connect setup page and enter a "connection code," thereby linking the actor-controlled Data Loader to the victim's environment.
>
> In the UNC6040 attacks, the app is used to export data stored in Salesforce instances and then use the access to move laterally through connected platforms such as Okta, Microsoft 365, and Workplace.
>
> Accessing these additional cloud platforms allows the threat actors to access more sensitive information stored on those platforms, including sensitive communications, authorization tokens, documents, and more. [1]

---

[1] Toulas, B. (2025, June 4). *Google: Hackers target Salesforce accounts in data extortion attacks*, Bleepingcomputer, available at: https://www.bleepingcomputer.com/news/security/google-hackers-target-salesforce-accounts-in-data-extortion-attacks/, last visited on September 8, 2025.

5. Since Google first reported the attacks, numerous data breaches have been connected to Salesforce software platforms – "numerous data breaches have been tied to the social engineering attacks, including Google itself, Cisco, Farmers Insurance, Workday, Adidas, Qantas, Allianz Life, and the LVMH subsidiaries Louis Vuitton, Dior, and Tiffany & Co."[2]

6. On August 26, 2025, TransUnion reported that the PII of 4,461,511 had been accessed in a data breach "involving a third party application" that TransUnion discovered on or about July 30, 2025 (the "Data Breach").[3]

7. Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect the PII of Plaintiffs and Class members; (ii) warn Plaintiffs and Class members of their inadequate information security practices; and (iii) contract with responsible contractors. Defendants' conduct amounts to at least negligence and violates federal statutes designed to prevent or mitigate this very harm.

8. Plaintiffs and Class Members have suffered actual, present, and foreseeable injuries as a direct result of the Data Breach, including: (a) theft of their PII; (b) costs associated with the detection and prevention of identity theft for their respective lifetimes; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of the Data Breach; (d) invasion of privacy; (e) the present and/or imminent injury arising from actual and/or potential fraud and identity theft posed by their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (f) damages to and diminution in value of their personal data entrusted to Defendants on the mutual understanding that Defendants would safeguard their PII against theft and not allow access to and misuse of their personal data by others; and (g) the continued risk to their PII, which remains in the possession of Defendants, and which is subject to further injurious breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs and

---

[2] Abrams, L. (2025, Aug. 26). *Salesloft breached to steal OAuth tokens for Salesforce data-theft attacks*, Bleepingcomputer, available at: https://www.bleepingcomputer.com/news/security/salesloft-breached-to-steal-oauth-tokens-for-salesforce-data-theft-attacks/, last visited on September 8, 2025.

[3] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html last visited on September 9, 2025.

Class Members' PII. Plaintiffs and Class Members, at the very least, are entitled to damages and injunctive relief tailored to address the vulnerabilities exploited in the breach, and designed to protect Plaintiffs and Class Members' PII, as well as an order directing the destruction and deletion of all PII for which Defendants cannot demonstrate a reasonable and legitimate purpose for continuing to maintain possession of such PII.

9. Defendants understand the need to protect the privacy of consumers and use security measures to protect Class Members' PII from unauthorized disclosure.

10. Defendants disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use.

11. As a result of Defendants' actions, the PII of Plaintiffs and Class Members was compromised through access to and exfiltration by an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

12. Plaintiffs by this action seek compensatory damages together with injunctive relief to remediate Defendants' failures to secure their and the other Class Members' PII, and to provide damages, among other things, for Plaintiffs and Class Members to secure identity theft insurance, and credit repair services for Class Members' respective lifetimes to protect the Class of Data Breach victims from identity theft and fraud.

## II. JURISDICTION AND VENUE

13. This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in

the proposed class, and at least one Class Member is a citizen of a state different from Defendants to establish minimal diversity.

14. Venue is proper under 18 U.S.C § 1391(b)(1) in this Judicial District as substantial acts and part of the events or omissions giving rise to the claims as alleged in this Class Action Complaint occurred in this District.

15. The Northern District of California has personal jurisdiction over Defendant Salesforce because Defendant has a principal place of business in this District.

16. The Northern District of California has personal jurisdiction over Defendant TransUnion because TransUnion conducts business in this District.

## III. PARTIES

**Plaintiff Amberly Watson**

17. Plaintiff Amberly Watson has periodically contacted TransUnion and provided sensitive PII to TransUnion in order to obtain copies of her credit report.

18. Plaintiff Amberly Watson is a citizen and resident of the State of California, currently residing in Ceres.

19. Plaintiff Amberly Watson learned of the Data Breach when she received a notice of the Data Breach from Defendant TransUnion on or shortly after August 28, 2025.

20. Plaintiff Amberly Watson is very careful with her PII and routinely checks her credit reports and financial statements to protect herself against fraud.

21. Plaintiff Amberly Watson would not have entrusted her PII to TransUnion or otherwise would have permitted her PII be provided to Salesforce, had she known that Defendants' data security practices were inadequate and susceptible to data disclosures and privacy violations.

**Plaintiff Shaquita Houston**

22. Plaintiff Shaquita Houston has periodically contacted TransUnion and provided sensitive PII to TransUnion in order to obtain copies of her credit report.

23. Plaintiff Shaquita Houston is a citizen and resident of the State of Alabama, currently residing in Hueytown.

24. Plaintiff Shaquita Houston learned of the Data Breach when she received a notice of the Data Breach from Defendant TransUnion on or shortly after August 28, 2025.

25. Plaintiff Shaquita Houston is very careful with her PII and routinely checks her credit reports and financial statements to protect herself against fraud.

26. Plaintiff Shaquita Houston would not have entrusted her PII to TransUnion or otherwise would have permitted her PII be provided to Salesforce, had she known that Defendants' data security practices were inadequate and susceptible to data disclosures and privacy violations.

**Plaintiff Lisa Chapman**

27. Plaintiff Lisa Chapman has periodically contacted TransUnion and provided sensitive PII to TransUnion in order to obtain copies of her credit report.

28. Plaintiff Lisa Chapman is a citizen and resident of the State of Maryland, currently residing in Upper Marlboro.

29. Plaintiff Lisa Chapman learned of the Data Breach when she received a notice of the Data Breach from Defendant TransUnion on or shortly after August 28, 2025.

30. Plaintiff Lisa Chapman is very careful with her PII and routinely checks her credit reports and financial statements to protect herself against fraud.

31. Plaintiff Lisa Chapman would not have entrusted her PII to TransUnion or otherwise would have permitted her PII be provided to Salesforce, had she known that Defendants' data security practices were inadequate and susceptible to data disclosures and privacy violations.

**Defendants**

32. Upon information and belief, Defendant Salesforce, Inc. is a Delaware corporation and has a principal place of business located at 15 Mission Street, 3rd Floor, San Francisco, California 94105.

33. Upon information and belief, Defendant TransUnion is limited liability corporation organized in Delaware and has a principal place of business located at 555 W. Adams Street, Chicago, IL 60661.

**IV. FACTUAL ALLEGATIONS**

34. On its website, Defendant Salesforce describes itself as "the world's leading customer relationship management technology."[4]

35. Defendant Salesforce also claims that "[w]e earn the trust of our customers, employees, and extended family through transparency, security, compliance, privacy, and performance. And we deliver the industry's most trusted infrastructure."[5]

36. Defendant Salesforce repeats similar language throughout its many different websites. For example, it says: "Trust is the bedrock of our company. It is written in the DNA of our culture, technology, and focus on customer success." [6] Salesforce has also stated that "[a]t Salesforce, we understand the importance of relationships. And at the core of every strong relationship is trust. Which is why we so strongly believe in being open and transparent; in empowering businesses by demystifying cybersecurity with real-time monitoring and user-friendly tools to help protect your sensitive data."

37. According to a recent news article, Defendant Salesforce employs 76,453 employees as of January 2025.[7]

---

[4] *What is Salesforce?*, available at: https://www.salesforce.com/in/products/what-is-salesforce/, last visited on September 8, 2025.

[5] *OUR VALUE, We act as trusted advisors*., available at: https://trust.salesforce.com/, last visited on September 8, 2025.

[6] *Trust* | *Security*, available at: https://security.salesforce.com/about, last visited on September 8, 2025.

[7] Goel, S. (2025, Sep. 1). *Marc Benioff says Salesforce has cut 4,000 roles in support because of AI agents*, Business Insider, available at: https://www.businessinsider.com/marc-benioff-says-salesforce-cut-4000-roles-because-of-agents-2025-9#:~:text=Marc%20Benioff%20says%20Salesforce%20has%20cut%204%2C000%20roles%20in%20support,deployed%20help.agentforce.com, last visited on September 8, 2025.

38. Defendant Salesforce provides services to companies, such as Defendant TransUnion, which use Salesforce's platform as a third-party customer relationship management system.

39. Salesforce clients then input the PII of their customers, including names, dates of birth, and social security numbers, among other sensitive information, into Salesforce's platform.

40. As a result, Salesforce possessed the PII of Plaintiffs and Class Members within its computer systems and those of its third-party providers.

41. Defendant Salesforce implicitly and/or explicitly represented to Plaintiffs and Class Members, that their PII would be secured.[8]

42. Salesforce had duties and obligations through common law, federal regulations, contracts, industry standards, and its representations to Plaintiffs and Class Members that it would adopt reasonable measures to protect the PII of Plaintiffs and Class Members from third party actors.

43. Despite possessing such duties and obligations, the Salesforce platform had common vulnerabilities, which were exploited by threat actors throughout 2025. Had Salesforce properly secured its platform, Plaintiffs and Class Member's PII would not have been at risk by Defendants' deficient security measures.

***The Data Breach***

44. Several companies have already reported data breaches related to the Salesforce platform, but did not expressly identify Salesforce as the underlying source of the cyberattack, instead "opting for phrasing like "third-party CRM."[9]

---

[8] *Privacy Policy*, available at: https://www.salesforce.com/company/legal/privacy/, last visited on September 8, 2025.

[9] Martin, H. (2025, Aug. 21). *Salesforce Data Theft Roundup: Everything You Need to Know*, Salesforce Ben, available at: https://www.salesforceben.com/salesforce-data-theft-roundup-everything-you-need-to-know/, last visited on September 8, 2025.

45. So far, in addition to TransUnion, other large companies like Farmers Group, Allianz Life Insurance, Adidas, Qantas, and Chanel have also faced data breaches related to the Salesforce data breaches.[10]

46. According to Google's Threat Intelligence Group ("Google"), the hacker group known as ShinyHunters/UNC6240 has been responsible for the many Salesforce related data breaches.[11] Google has stated that ShinyHunters has compromised several organizations' Salesforce instances for large-scale data theft and subsequent extortion. Additionally, ShinyHunters utilized existing Salesforce applications such as Data Loader, and persuaded victims to open the Salesforce connect setup page and link the "actor-controlled Data Loader to the victim's environment."

47. As a result, with all of these data breaches, Defendant Salesforce has served as the nexus or hub of all data breach activity.

48. Companies such as Defendant TransUnion are the spokes in this hub and spoke activity where Defendant Salesforce has caused each respective spoke to sustain data breaches due to Defendants' inadequate security measures.

49. Each spoke has experienced a data breach as a result of Salesforce's inadequate security measures, because of the unlawful activity conducted by cybercriminals such as ShinyHunters.

50. The inadequate security measures at Salesforce are evident because Salesforce has allowed cybercriminals to access the databases of its clients repeatedly, through Salesforce's own platform, and using the same or similar methods for each data breach.

**TransUnion Data Breach**

---

[10] *Id*.

[11] Google Threat Intelligence Group (2025, June 4). *The Cost of a Call: From Voice Phishing to Data Extortion*, Google, available at: https://cloud.google.com/blog/topics/threat-intelligence/voice-phishing-data-extortion?rev=7194ef805fa2d04b0f7e8c9521f97343, last visited on September 8, 2025.

51. On or about July 28, 2025, a third-party actor gained access to the PII of consumers that had been collected by, or on behalf of TransUnion and provided to SalesForce and that had been stored on SalesForce servers.[12] The third party actor accessed the PII stored therein, and exfiltrated information relating to approximately 4.46 million people.

52. The compromised data included names, dates of birth, Social Security numbers, billing addresses, email addresses, phone numbers, reasons for customer transactions (such as requests for a free credit report), and customer support tickets and messages.[13]

53. TransUnion implicitly and/or explicitly represented to Plaintiffs and Class Members, that their PII would be secured.[14]

54. However, despite having the knowledge since July 30, 2025, that the data breach occurred on July 28, 2025, and that the majority of its customers had been impacted, TransUnion did not immediately notify all its customers and employees of the breach.

55. It was only on August 26, 2025 that it was revealed to the public that the data breach had occurred – causing unnecessary delay and stopping affected individuals from securing their data.

56. The notice provided by TransUnion to individuals impacted by the data breach understated the significance of the data breach, stating that "unauthorized access includes some limited personal information belonging to you" and claiming that the exfiltrated data did not

---

[12] Data Breach Notifications, Office of the Maine Attorney General, available at: https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html, last visited September 9, 2025.

[13] Knutsson, K., , (2025, Aug. 31), *TransUnion becomes latest victim in major wave of Salesforce-linked cyberattacks, 4.4M Americans affected*, Fox News, available at: https://www.foxnews.com/tech/transunion-becomes-latest-victim-major-wave-salesforce-linked-cyberattacks-4-4m-americans-affected, last visited September 9, 2025.

[14] Data Security statement, https://www.transunion.com/client-support/data-security, last visited September 19, 2025.

include "core credit information" despite the fact that critical PII like Social Security numbers was impacted by the data breach.[15]

***The Value of Personally Identifiable Information (PII)***

57. PII is very valuable to criminals, as evidenced by the prices they will pay for it on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information is sold at prices ranging from $40 to $200, and bank details have a price range of $50 to $200.[16]

58. Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[17]

59. Social Security numbers are among the most sensitive kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[18]

---

[15] TransUnion Sample Letter, https://www.maine.gov/cgi-bin/agviewerad/ret?loc=2968, last visited on September 9, 2025

[16] George, A. (2019, Oct. 16). *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, Digital Trends, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/, last visited on September 8, 2025.

[17] Luthi, B. (2017, Dec. 6). *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/, last visited on September 8, 2025.

[18] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf, last visited on September 8, 2025.

60. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against potential misuse of a Social Security number is not permitted; an individual instead must show evidence of actual, ongoing fraud to obtain a new number.

61. Even then, a new Social Security number may not be effective. According to the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[19]

62. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, in that situation, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—name, birthdate, financial history, and Social Security number.

63. This data commands a much higher price on the black market. "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[20]

64. Identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police, among other forms of fraud.

65. The PII of Plaintiffs and Class Members was taken by hackers to engage in identity theft and/or to sell it to other criminals who purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

---

[19] Naylor, B. (Feb. 9, 2015). *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft, last visited on September 8, 2025.

[20] Greene, T. (Feb. 6, 2015). *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html, last visited on September 8, 2025.

66. Further, there may be a time lag between when harm occurs and when it is discovered and between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[21]

67. Plaintiffs and Class Members now face a lifetime of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damage in addition to any fraudulent use of their PII.

***Large Companies are Regularly Targeted by Cybercriminals***

68. Defendant Salesforce was, or should have been, fully aware of the unique type and the significant volume of data on its network, comprising millions of individuals' detailed and confidential personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

69. Data thieves regularly target companies like Salesforce due to the large volumes of PII that they come into possession of.

70. As custodians of Plaintiffs and Class Member's PII, Defendants knew or should have known the importance of protecting the PII of Plaintiffs and Class Members, and of the foreseeable consequences if any data breaches occurred.

71. Defendants' security obligations were especially important due to the substantial up-tick of cyber-attacks and data breaches occurring in recent years.

72. Furthermore, Defendants should have been vigilant in protecting data as companies such as Salesforce are especially targeted for cyber-attacks.

---

[21] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* http://www.gao.gov/new.items/d07737.pdf, last visited on September 8, 2025.

***Common Injuries and Damages to Plaintiffs and Class Members***

73. Although it is believed that TransUnion has offered identity monitoring services for a limited time, the offered services are inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the highly sensitive nature of the PII at issue here.

74. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures to protect the PII of Plaintiffs and Class Members.

75. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members are presently experiencing and will continue experiencing actual harm from fraud and identity theft.

76. Plaintiffs and Class Members are presently experiencing substantial risk of out-of-pocket fraud losses, such as loans opened in their names, tax return fraud, utility bills opened in their names, and other identity theft.

77. Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class Members.

78. Plaintiffs and Class Members are also incurring and may continue incurring out-of- pocket costs for protective measures such as credit monitoring fees (for any credit monitoring obtained in addition to or in lieu of the inadequate monitoring offered by Defendant), credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

79. Plaintiffs and Class Members also suffered a loss of value of their PII when it was acquired by the cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

80. Plaintiffs and Class Members have suffered actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses

and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent loans, insurance claims, tax returns, and/or government benefit claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing 'freezes' and 'alerts' with credit reporting agencies;

d. Spending time with financial institution or government agencies to dispute fraudulent charges and/or claims;

e. Contacting financial institutions and closing or modifying financial accounts; and

f. Closely reviewing and monitoring Social Security number, bank accounts, payment card statements, and credit reports for unauthorized activity for years to come.

81. Moreover, Plaintiffs and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing sensitive and confidential personal, and/or financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

82. Further, as a result of Defendants' conduct, Plaintiffs and Class Members are forced to live with the anxiety that their PII may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

83. As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and are at a substantial and present risk of harm.

## IV. CLASS ACTION ALLEGATIONS

84. Plaintiffs bring this action as a class action pursuant to Rule 23 *et seq.* of the Federal Rules of Civil Procedure on behalf of the Class.

85. Plaintiffs propose the following Class Definition:

> **All individuals residing in the United States whose Personal Identifying Information was compromised, accessed, or acquired by an unauthorized party as a result of the Data Breach.**

86. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, members, affiliates, officers and directors, and any entity in which a Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff.

87. Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

88. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

89. Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These questions include but are not limited to:

a. Whether Defendants failed to adequately safeguard the PII of Plaintiffs and Class Members;

b. Whether and to what extent Defendants had a duty to protect the PII of Plaintiffs and Class Members;

c. Whether Defendants had a duty not to use the PII of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

e. Whether Defendants failed to implement and maintain reasonable security procedures and practices adequate to protect the information compromised in the Data Breach, considering its nature and scope;

f. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

g. Whether Defendants violated any statutes as alleged herein;

h. Whether Defendants engaged in unfair, unlawful, or deceptive practices, including by failing to safeguard the PII of Plaintiffs and Class Members;

i. Whether Plaintiffs and Class Members are entitled to damages as a result of Defendants' wrongful conduct;

j. Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

k. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

90. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

91. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. No Plaintiffs has a disabling conflict of interest with any other Member of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class, and the infringement of rights and the damages they have suffered are typical of other Class Members. Plaintiffs also have retained counsel experienced in complex class action litigation, and they intend to prosecute this action vigorously.

92. As provided under Fed. R. Civ. P. 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct in relation to the Class and making final injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole.

Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs challenges these policies by reference to Defendants' conduct with respect to the Class as a whole.

93. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

94. Consistent with Fed. R. Civ. P. 23(b)(3), class treatment is superior to all other available methods for the fair and efficient adjudication of this controversy. Among other things, it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Moreover, class action treatment will permit the adjudication of relatively modest claims by Class Members who could not individually afford to litigate a complex claim against large corporations such as Defendants. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

95. Particular issues, such as questions related to Defendants' liability, are also appropriate for certification under Fed. R. Civ. P. 23(c)(4) because the resolution of such common issues would materially advance the resolution of this matter and the parties' interests therein.

96. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1), in that the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. Prosecution of separate actions by Class Members also would create the risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

**COUNT I**

**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Class against Defendants)**

97. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

98. Plaintiffs bring this claim on behalf of themselves and the Class.

99. As a condition of using the service of Defendants or their partners or affiliates, Plaintiffs and the Class were required to provide and entrust Defendants with certain PII, including their name, birthdate, address, loan number, Social Security number, and other information.

100. Plaintiffs and the Class entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

101. By undertaking the duty to maintain and secure this data, sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their systems and networks—and Plaintiffs and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from cyber theft.

102. Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed or obtained by unauthorized parties.

103. Defendants knew or reasonably should have known that their failure to exercise due care in the collecting, storing, and using of consumers' PII involved an unreasonable risk of harm to Plaintiffs and the Class, including harm that foreseeably could occur through the criminal acts of a third party.

104. Defendants had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendants' security protocols to ensure that Plaintiffs and Class Members' information in their possession was adequately secured and protected.

105. Defendants also had a duty to exercise appropriate practices to remove former customers' PII that they were no longer required to retain pursuant to regulations.

106. Defendants had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs and the Class's PII, and to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Class.

107. Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendants with their confidential PII, a mandatory step in receiving services from Defendants. While this special relationship exists independent from any contract, it is recognized by Defendants' Privacy Policies, as well as applicable laws and regulations. Specifically, Defendants actively solicited and gathered PII as part of their business and was solely responsible for and in the position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class members from a resulting data breach.

108. Defendants were subject to an independent duty, untethered to any contract between Defendants and Plaintiffs and the Class, to maintain adequate data security.

109. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

110. Defendants also had a common law duty to prevent foreseeable harm to others. Plaintiffs and the Class were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of adequately safeguarding that PII, and the necessity of encrypting PII stored on Defendants' systems. It was foreseeable that Plaintiffs and Class members would be harmed by the failure to protect their personal information because hackers are known to routinely attempt to steal such information and use it for nefarious purposes.

111. Defendants' conduct created a foreseeable risk of harm to Plaintiffs and the Class. Defendants' wrongful conduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included their decision not to comply with industry standards for the safekeeping of Plaintiffs and the Class's PII, including basic encryption techniques available to Defendants.

112. Plaintiffs and the Class had and have no ability to protect their PII that was in, and remains in, Defendants' possession.

113. Defendants were in a position to effectively protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

114. Defendants had and continue to have a duty to adequately disclose that the PII of Plaintiffs and the Class within Defendants' possession was compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

115. Defendants have admitted that the PII of Plaintiffs and the Class was wrongfully accessed by unauthorized third persons as a result of the Data Breach.

116. Defendants, through their actions and inaction, unlawfully breached their duties to Plaintiffs and the Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and the Class when the PII was within Defendants' possession or control.

117. Defendants improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

118. Defendants failed to heed industry warnings and alerts to provide adequate safeguards to protect their current and former customers' PII in the face of increased risk of theft.

119. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and the Class by failing to have appropriate procedures in place to detect and prevent dissemination of their current and former customers' PII.

120. Defendants, by their actions and/or omissions, unlawfully breached their duty to adequately and timely disclose to Plaintiffs and the Class the existence and scope of the Data Breach.

121. But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

122. There is a close causal connection between (a) Defendants' failure to implement security measures to protect the PII of Plaintiffs and the Class and (b) the harm or risk of imminent harm suffered by Plaintiffs and the Class. Plaintiffs and the Class's PII was accessed and exfiltrated as the direct and proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

123. Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of businesses, such as Defendants, of failing to implement reasonable measures to protect PII. The FTC Act and related authorities form part of the basis of Defendants' duties in this regard.

124. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the damages that would result to Plaintiffs and the Class.

125. Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

126. Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

127. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses,

which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

128. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs and Class Members' respective lifetimes; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and other identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the current and former customers' PII in their continued possession; and (viii) present and future costs in the form of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the compromise of PII as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class Members.

129. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

130. Additionally, as a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

131. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiffs and the Class are now at an increased risk of identity theft or fraud.

132. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiffs and the Class are entitled to and demand actual, consequential, and nominal damages and injunctive relief to be determined at trial.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class against Defendants)**

133. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

134. Plaintiffs bring this claim on behalf of themselves and the Class.

135. Defendants acquired and maintained the PII of Plaintiffs and the Class, including names, dates of birth, Social Security numbers, billing addresses, email addresses, phone numbers, and information provided in connection with Defendants' business.

136. At the time Defendants acquired the PII of Plaintiffs and the Class, there was a meeting of the minds and a mutual understanding that Defendants would safeguard the PII and not take unjustified risks when storing the PII.

137. Plaintiffs and the Class would not have entrusted their PII to Defendants had they known that Defendants would not properly secure the PII, and not delete the PII that Defendants no longer had a reasonable need to maintain.

138. Defendants further implicitly promised to comply with industry standards and to ensure that Plaintiffs and the Class Members' PII would remain protected.

139. Implicit in the agreements between Plaintiffs and the Class and Defendants to provide PII, was the latter's obligation to:

a. Use such PII for business purposes only;

b. Take reasonable steps to safeguard the PII;

c. Prevent unauthorized disclosures of the PII;

d. Provide Plaintiffs and the Class with prompt and sufficient notice of any and all unauthorized disclosure or uses; and

e. Retain the PII only under conditions that kept such information secure and confidential.

140. In collecting and maintaining the PII of Plaintiffs and the Class and publishing their privacy policies, Defendants entered into implied contracts with Plaintiffs and the Class requiring Defendants to protect and keep secure the PII of Plaintiffs and the Class.

141. Plaintiffs and the Class fully performed their obligations as required with Defendants.

142. Defendants breached the implied contract it made with Plaintiffs and the Class by failing to protect and keep private the financial information of Plaintiffs and the Class, including failing to;

a. Encrypt or tokenize the sensitive PII of Plaintiffs and the Class;

b. Delete such PII that Defendants no longer had reason to maintain;

c. Eliminate the potential accessibility of the PII where such accessibility was not justified; and

d. Otherwise review and improve the security of the network system that contained such PII.

143. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiffs and the Class have suffered (and will continue to suffer): ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; additional time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, credit freezes; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

144. As a direct and proximate result of Defendants' breach of implied contract, Plaintiffs and the Class are at an increased risk of identity theft or fraud.

145. As a direct and proximate result of Defendants' breach of implied contracts, Plaintiffs and the Class are entitled to and demand actual, consequential, and nominal damages and injunctive relief, to be determined at trial.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Class against Defendants)**

146. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

147. Plaintiffs bring this claim on behalf of themselves and the Class.

148. A relationship existed between Defendants and Plaintiffs and the Class in which Plaintiffs and the Class put their trust in Defendants to protect the PII of Plaintiffs and the Class and Defendants accepted that trust.

149. Defendants breached the fiduciary duty that they owed to Plaintiffs and the Class by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect the private information of Plaintiffs and the Class.

150. Defendants' breach of fiduciary duty was a legal cause of damage to Plaintiffs and the Class.

151. But for Defendants' breach of fiduciary duty, the damage to Plaintiffs and the Class would not have occurred.

152. Defendants' breach of fiduciary duty contributed substantially to producing the damage to Plaintiffs and the Class.

153. As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiffs and the Class are entitled to and demand actual, consequential, and nominal damages and injunctive relief.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class against Defendants)**

154. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

155. Defendants required Plaintiffs and Class Members to provide their PII in order to engage in business.

156. Plaintiffs and Class Members conferred a monetary benefit on Defendants by providing their PII.

157. Defendants did not secure Plaintiffs' and the Class Members' PII, and therefore, did not fairly compensate Plaintiffs or the Class Members for the value of their PII.

158. Had Plaintiffs and the Class Members known that Defendants would not adequately protect their PII, they would not have agreed to entrust it to Defendants.

159. Under the circumstances, Defendants would be unjustly enriched by being permitted to retain any of the benefits that Plaintiffs and the Class conferred onto it.

160. Plaintiffs and the Class have sustained injuries as a result of Defendants' conduct, and Plaintiffs and the Class are without an adequate remedy.

161. Plaintiffs and the Class are entitled to restitution from Defendants and a disgorgement of profits, benefits and other compensation received by Defendants as a result of their wrongful conduct.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class against Defendants)**

162. Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163. Plaintiffs bring this claim on behalf of themselves and the Class.

164. The Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq*., authorizes this Court to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes as applicable here.

165. Defendants owe duties of care to Plaintiffs and Class Members, which require Defendants to adequately secure Plaintiffs and the Class Member's PII.

166. Due to the Data Breach, Plaintiffs and the Class Member's PII have been unnecessarily put at risk.

167. An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Plaintiffs and the Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and the Class from further data breaches that compromise their PII.

168. Accordingly, Plaintiffs and the Class request this Court under the Declaratory Judgment Act to enter a judgment declaring the following:

a. Defendants owe a legal duty to secure the PII of their former and current customers of Defendant;

b. Defendants have breached their duty to Plaintiffs and the Class by allowing the Data Breach to occur;

c. Defendants continue to breach their legal duty by failing to employ reasonable means to secure the PII of Defendants' former and current customers.

d. Defendants' ongoing breaches of said duty continue to cause Plaintiffs and the Class harm.

169. Plaintiffs and the Class, therefore, seek a declaration that (1) Defendants' existing security measures do not comply with their obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect consumers' PII, and (2) to comply with their duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training their security personnel regarding any new or modified procedures;

d. Segmenting user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

e. Conducting regular database scanning and security checks;

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g. Purchasing credit monitoring services for Plaintiffs and Class Members for their respective lifetimes; and

h. Meaningfully educating Plaintiffs and Class Members about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

170. The Court should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with the law and industry standards to protect Plaintiffs and Class Members' PII.

171. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendants' systems or networks. The risk of another breach is real, immediate, and substantial.

172. The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. If another data breach occurs, Plaintiffs and the Class will likely be subjected to fraud, identity theft, and other harms described herein. But, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is minimal given they have pre-existing legal obligations to employ these measures.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members, requests judgment against Defendants and that the Court grant the following:

a. An Order certifying the Class, as defined herein, and appointing Plaintiffs and their counsel to represent the Class;

b. Equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs and the Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and the Class Members;

c. Injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i. Prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. Requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. Requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs and Class Members' respective lifetimes;

iv. Requiring Defendants to delete, destroy, and purge the PII of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

v. Requiring Defendants to implement and maintain a comprehensive Information Security Program designed to

protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

vi. Prohibiting Defendants from maintaining Plaintiffs and Class Members personally identifying information on a cloud-based database;

vii. Requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by third-party security auditors;

viii. Requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. Requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

x. Requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of a Defendants' network is compromised, hackers cannot gain access to other areas of Defendants' systems;

xi. Requiring Defendants to conduct regular database scanning and securing checks;

xii. Requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personally identifying information, as well as protecting the personally identifying information of Plaintiffs and Class Members;

xiii. Requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform

internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv. Requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personally identifying information;

xv. Requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi. Requiring Defendants to adequately educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvii. Requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and, for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to Class Counsel, and to report any material deficiencies or noncompliance with the Court's final judgment;

d. For an award of damages, including actual, statutory, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

e. For an award of reasonable attorneys' fees, costs, and litigation expenses, as allowed by law;

f. For prejudgment interest on all amounts awarded; and

g. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 22, 2025

*/s/ Stephen R. Basser*

**BARRACK, RODOS & BACINE**

Stephen R. Basser
Samuel M. Ward
One America Plaza
600 W Broadway #900
San Diego, CA 92101
Tel: (619) 230-0800
sbasser@barrack.com
sward@barrack.com

Andrew J. Heo*
Two Commerce
2001 Market Street, Suite #3300
Philadelphia, PA 19103
Tel: (215) 963-0600
aheo@barrack.com

*Attorneys for Plaintiffs and the Proposed Class*

**pro hac vice application forthcoming*